UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



ELMER ORTIZ,

                Plaintiff,

-v-

ANTHONY ANNUCCI, MICHAEL CAPRA,
S. HOLLIDAY, and CORRECTIONS
OFFICER JOHN/JANE DOES #1-10,

                Defendants.

No. 17-cv-3620 (RJS)
OPINION & ORDER

RICHARD J. SULLIVAN, Circuit Judge:

      Plaintiff Elmer Ortiz brings this action pursuant to 42 U.S.C. § 1983 against officials of the New York State Department of Corrections and Community Supervision ("DOCCS"), alleging violations of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in connection with a use-of-force incident at Sing Sing Correctional Facility. Now before the Court are Defendants' motions for partial dismissal of the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) and for summary judgment based on Plaintiff's failure to exhaust administrative remedies. For the reasons set forth below, the motion for partial dismissal is GRANTED, and the motion for summary judgment is DENIED.

I. BACKGROUND

A. Plaintiff's Allegations[1]

      Plaintiff alleges that on December 28, 2014, while he was an inmate at Sing Sing

---

[1] The facts in this subsection, which principally relate to Defendants' motion to dismiss, are taken from the Second Amended Complaint. (Doc. No. 24 ("SAC").) In ruling on that motion, the Court has also considered Defendants' memorandum of law (Doc. No. 31 ("Mem.")), Plaintiff's memorandum of law in opposition (Doc. No. 39 ("Opp'n")), and Defendants' reply memorandum (Doc. No. 43 ("Reply.")).

Correctional facility in Ossining, New York, he was assaulted and seriously injured by several corrections officers, including Corrections Officer S. Holliday. (SAC ¶¶ 15–16.) The attack allegedly occurred around 5:00 pm on the HB 5 mess hall bridge. (*Id.*) According to Plaintiff, he was "stomped on, kicked, punched[,] and thrown to the ground while handcuffed," which resulted in significant bruising and a laceration to his forehead that required six stitches at an outside medical facility. (*Id.* ¶¶ 19–20.) Plaintiff claims that, after the assault, Defendant Holliday and others denied him clearly necessary medical attention for three hours. (*Id.* ¶¶ 23–24.)

After the incident, Plaintiff alleges he was moved to solitary confinement in the Special Housing Unit ("SHU") to cover up the assault and deny him access to the grievance process. (*Id.* ¶ 37.) He claims that, while in the SHU on December 30, 2014, he attempted to submit a grievance to the Inmate Grievance Resolution Committee ("IGRC") by handing it to a patrolling corrections officer for delivery. (*Id.* ¶ 25.) However, Plaintiff maintains that this grievance was never filed by the officer. (*Id.* ¶ 26.) Plaintiff claims that, after receiving no response from the IGRC, he appealed to Sing Sing's Superintendent, Michael Capra, and, upon receiving no ruling from Capra, appealed to the Central Office Review Committee ("CORC"). (*Id.* ¶¶ 27–28, 35.) Shortly after the assault, Plaintiff was transferred to another correctional facility, where he claims he was deprived of his legal papers in an effort to impede the prosecution of his grievance. (*Id.* ¶ 38.)

Plaintiff also asserts that Superintendent Capra and DOCCS Commissioner Anthony Annucci supervised the corrections officers who assaulted him and knew or were willfully ignorant of previous civil rights violations committed by those officers. (*Id.* ¶ 18.) Specifically, Plaintiff points to the fact that Defendant Holliday had been previously sued by an inmate in the case *Tirado v. Shutt et al.*, 13-cv-02848 (LTS), had numerous prior excessive force complaints against him, and was generally a "known problem" at Sing Sing. (*Id.* ¶ 33.) As to Defendant Annucci, Plaintiff

alleges that, in his capacity as DOCCS Comissioner, Annucci "implemented and institutionalized" and thereafter "failed to remedy" policies and practices that were known, or should have been known, to lead to violations of inmates' constitutional rights. (*Id.* ¶ 51.)

B. The DOCCS Grievance Process[2]

DOCCS administers the Inmate Grievance Program ("IGP"), which ordinarily requires prisoners to complete a three-step process in order to exhaust administrative remedies. *See* N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5; *see also* DOCCS Directive #4040. At step one, the prisoner is obligated to file a grievance, consisting of, among other things, "a concise, specific description of the problem and the action requested," with the IGRC within twenty-one calendar days of the incident. *Id.* § 701.5(a). Inmates who – like Plaintiff at the time of the alleged incident – are housed in the SHU may file grievances by handing them to staff members, including corrections officers, to be hand-delivered to the grievance office.[3] (*Id.* § 701.7(a); *see also* Declaration of Quandera Quick, Doc. No. 32 at 4 ("Quick Decl.") ¶ 10.) After a grievance is filed, the IGRC has sixteen calendar days from receipt of the grievance to either informally resolve the issue or hold a hearing, after which a written decision must be issued within two working days. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(b). At step two, a prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility within seven calendar days of the ruling by completing and signing the appeal section on his IGRC response form and submitting it to the

---

[2] The facts in subsections B and C, which principally relate to Defendants' motion for summary judgment, are taken from Defendants' Local Civil Rule 56.1 Statement (Doc. No. 33 ("Def. 56.1")), Plaintiff's Response to Defendants' Rule 56.1 Statement (Doc. No. 42 ("56.1 Response")), the declarations submitted in support of and in opposition to Defendants' motion for summary judgment, and the exhibits attached thereto (Doc. Nos. 32, 40–41). Unless otherwise noted, where Defendants' Rule 56.1 Statement is cited, Plaintiff does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.

[3] Plaintiff does not dispute the details of the IGP grievance framework, but maintains that Section 701.1 does not address situations when inmates are housed in the SHU and corrections officers fail to file their grievances. (*See, e.g.*, 56.1 Response ¶ 7.)

grievance clerk. *Id.* § 701.5(c). The superintendent then has twenty calendar days to respond to the prisoner's appeal. *Id.* Finally, at step three, the prisoner may appeal an adverse decision from the superintendent by submitting a "notice of decision to appeal" form to CORC within seven days. *Id.* § 701.5(d). If at any level of review the decisionmaker fails to timely respond to the grievance, the inmate may – and, in order to exhaust, must – appeal to the next level. *Id.* § 701.6(g).

The IGP also provides an expedited review process for grievances that allege "harassment" by prison staff – in other words, "employee misconduct meant to annoy, intimidate[,] or harm an inmate." N.Y. Comp. Codes R. & Regs., tit. 7, § 701.2(e). Under the expedited process, the grievance is forwarded directly to the facility superintendent, who has twenty-five calendar days to respond. *Id.* § 701.8. An expedited grievance must still be initially filed with the facility's IGRC. *Id.* § 701.8(a).

The IGP regulations are available in the law library of every DOCCS correctional facility, and inmates who are confined to the SHU may be provided these materials for in-cell use upon request. (Def. 56.1 ¶¶ 3–5.) Plaintiff was given a pamphlet explaining the grievance process upon entering DOCCS custody, which he reviewed and understood.[4] (Def. 56.1 ¶¶ 29–30.) Plaintiff also acknowledges that he was familiar with the grievance process because four months before the incident in question, he filed and appealed a grievance within the proper time periods. (Declaration of Elmer Ortiz, Doc. No. 40 ("Ortiz Decl.") ¶ 9.)

Under DOCCS Directive #4040, grievance files, including appeals, must be maintained for the current year and the previous four calendar years. *See also* N.Y. Comp. Codes R. & Regs., tit. 7, §701.6(k)(3). Additionally, CORC maintains files of grievance appeals, and its computer

---

[4] Plaintiff does not dispute this fact, but opposes the inference that his understanding of the general IGP grievance procedure is applicable to the instant grievance due to his position that Section 701.1 does not address situations when inmates are housed in the SHU and corrections officers fail to file their grievances. (*See, e.g.*, 56.1 Response ¶¶ 29–30.)

4

database contains records dating back to 1990 of all appeals of grievances from the IGRC and the expedited procedure. (Def. 56.1 ¶ 26; Declaration of Rachael Seguin, Doc. No. 32 at 12 ("Seguin Decl.") ¶ 19.) At Sing Sing, if an inmate appeals to the superintendent, a copy is forwarded to the grievance office, which maintains appeal records for the current calendar year and the past four calendar years. (Def. 56.1 ¶ 28.)[5]

### C. Plaintiff's Efforts to Exhaust

Defendants contend that Plaintiff failed to complete any step of the grievance process, pointing to the absence of any records at Sing Sing of Plaintiff filing a grievance related to the December 28, 2014 incident or the appeal of any such grievance to the Superintendent, and the absence of any CORC records regarding Plaintiff's filing of any appeal. (*Id.* ¶¶ 33–34.) Specifically, Defendants rely on declarations from IGP Supervisor Quandera Quick, Defendant Michael Capra, and DOCCS Assistant IGP Director Rachael Seguin. (Doc. No. 32.) Ms. Quick attests that a review of Sing Sing's records failed to uncover any grievance or related documentation, that she has no personal recollection of having received such documents, and that if any grievance had been received, such documentation would have been maintained in Sing Sing's files. (Quick Decl. ¶ 14.)[6] Defendant Capra states that a search of his office, including of the computer system and hard files, failed to uncover any appeal from Plaintiff. (Doc. No. 32 at 9 ("Capra Decl.") ¶ 5). Furthermore, according to Ms. Seguin's declaration, a diligent search of the CORC computer database showed that Plaintiff had never appealed to CORC about any issue. (Seguin Decl. ¶¶ 22–23.)

---

[5] Although Plaintiff does not dispute the contents of Sing Sing's general policy with respect to the retention of grievance records, he maintains that Sing Sing's IGP supervisor, Quandera Quick, routinely destroyed inmate correspondence relating to grievances and appeals. (56.1 Response ¶¶ 33–34.)

[6] Ms. Quick also clarified that, although there is no DOCCS Directive governing the retention of non-grievance inmate correspondence, her "personal practice is to retain such correspondence as long as there is room to do so," while periodically "discard[ing] older correspondence to make space for newer" correspondence. (Quick Decl. ¶ 13.)

For his part, Plaintiff claims that he completed all three steps of the IGP. According to Plaintiff, while in the SHU on December 30, 2014, he requested a grievance form from the patrolling corrections officer, but was denied access to the form. (Ortiz Decl. ¶ 14.) He further maintains that, following that denial, he wrote a grievance complaint on plain stationery, made a contemporaneous copy, and placed the original in an envelope addressed to the IGRC, which he subsequently dropped into a mailbox held by the patrolling officer. (*Id.* ¶¶ 15–17.) Plaintiff alleges that, at this point, his grievance was "thrown out, discarded, or in some other way destroyed," as the complaint was never filed with the grievance clerk. (*Id.* ¶ 19.)

Plaintiff further asserts that on February 3, 2015, after failing to receive a response from the IGRC, he requested an appeal form from the patrolling corrections officer and was again denied access to the proper form. (*Id.* ¶ 25.) Once again, he then used plain stationery to write an appeal to Superintendent Capra, making a contemporaneous copy and sending the original to the grievance committee. (*Id.* ¶ 26.) On February 10, 2015, Plaintiff received a response from Ms. Quick, stating that it was unclear which grievance Plaintiff wanted appealed because there was no record of the December 30 grievance on file. (*Id.* ¶ 27; *see also* Doc. No. 41 Ex. 3.)[7] Plaintiff claims he then immediately appealed to CORC. (Ortiz Decl. ¶ 36.) After receiving no response, Plaintiff wrote letters to Governor Cuomo, the Westchester District Attorney, and the Commissioner of DOCCS about the incident. (*Id.* ¶¶ 44–46.)

In support of his claims, Plaintiff points not only to his own testimony (*see* Ortiz Decl.), but also to the copies of the alleged December 30, 2014 grievance and subsequent appeal to Superintendent Capra that he maintained (Doc. No. 41 Exs. 1–2). The copy of the grievance details the December 28 incident, requests an independent investigation, and calls for Defendant

---

[7] Ms. Quick concedes that the February 10, 2015 correspondence "appears to be authentic" but states that she no longer has copies of any correspondence from that date. (Quick Decl. ¶ 15.)

6

Holliday and the other officers to be "held accountable for their unprofessional conduct." (Doc. No. 41 Ex. 1.) Meanwhile, the copy of the appeal, sent to Sing Sing's grievance office, states that sixteen calendar days had passed without a decision and that Plaintiff was therefore exercising his right to appeal to the Superintendent under Section 701.5(a)(1). (Doc. No. 41 Ex. 2.) Plaintiff also argues that the fact that these documents were drafted using ordinary stationery, rather than the correct forms, is "a clear sign that something was amiss" and that "someone was refusing [Plaintiff] access to [the] grievance process." (Opp'n at 10, 12.) Furthermore, Plaintiff submits as evidence affidavits from three fellow inmates and statements of three corrections officers regarding the December 28 incident, which were presented at a January 2015 hearing as part of Sing Sing's use-of-force investigation into the incident. (Doc. No. 41 Exs. 8–14.)

D. Procedural History

Plaintiff filed the first Complaint in this action on May 15, 2017 and an Amended Complaint on October 2, 2017. (Doc. Nos. 1, 15.) On November 9, 2017, the Court held an initial conference, which also served as a pre-motion conference regarding Defendants' contemplated motion to dismiss. On November 30, 2017, Plaintiff filed the Second Amended Complaint (Doc. No. 24 ("SAC")), the operative pleading in this case, setting forth claims against Defendants Holliday, Annucci, Capra, and ten unnamed corrections officers for violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments stemming from the use of excessive force, failure to protect, denial of medical services, unconstitutional placement in solitary confinement, improper transfer to another facility, and destruction of legal papers (*id.* ¶¶ 24, 37–38, 48, 53, 56–59, 63–64).[8]

On March 29, 2018, following limited discovery on the subject of exhaustion, Defendants

---

[8] The John Doe Defendants have not been identified or served in this action.

Holliday, Annucci, and Capra (collectively, "Defendants") filed their motions to partially dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) and for summary judgment on exhaustion grounds. (Doc. No. 30.) On the same day, Defendants filed a memorandum of law and declaration in support of the motions, as well as a Local Rule 56.1 Statement. (Doc. Nos. 31–33.) Plaintiff filed a memorandum of law and declarations in opposition to the motions on May 31, 2018. (Doc. Nos. 39–42.) The motions were fully briefed on June 15, 2018, when Defendants filed their reply brief. (Doc. No. 43.)

## II. Motion to Partially Dismiss the SAC

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) all claims other than the excessive-force and failure-to-protect claims against Defendant Holliday. For the reasons stated below, the motion to partially dismiss the SAC is granted.

### A. Legal Standard

To withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556

8

U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 570.

B. Claims Against Superintendent Capra and Commissioner Annucci

With respect to Defendants Capra and Annucci, Plaintiff alleges that, in their capacity as supervisors, they were aware of prior violations by Defendant Holliday but took no steps to prevent him from assaulting Plaintiff and, furthermore, implemented and maintained policies that they knew would lead to violations of inmates' rights. Defendants maintain that the SAC's conclusory allegations are insufficient to state a claim against either Defendant. The Court agrees.

In a Section 1983 action, the plaintiff must demonstrate that the defendant was personally involved in the alleged constitutional violation. *See Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001). The personal involvement of a supervisor may be demonstrated by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Plaintiff fails to set forth sufficient facts with respect to any of the above categories to state a plausible claim for relief. *See Twombly*, 550 U.S. at 570. As to both Defendant Capra and Annucci, the SAC alleges that they were "acting supervisors of the corrections officers who assaulted" Plaintiff, that they "knew or were willfully ignorant of prior civil rights violations by the assaulting officers," and that they "knew of the actions and policies that led up to the assault." (SAC ¶ 18.) As to Defendant Capra, the SAC alleges that he was "aware of the incident involving

9

[Plaintiff] and the events leading up to it" because Plaintiff "made a grievance that was destroyed" and because Defendant Holliday was "already a known problem." (*Id.* ¶ 33.) In support of the latter claim, the SAC asserts that: (1) Defendant Holliday had been previously sued by an inmate, (2) "an investigation was conducted regarding the incident," yielding witness statements that claimed Defendant Holliday "was the aggressor," and (3) there had been "numerous prior complaints" about Defendant Holliday. (*Id.*) The SAC maintains that "despite a mountain of evidence" purportedly demonstrating that Defendant Holliday "was a problem within Sing Sing," Defendant Capra "at the very least ignored the problem, or at the most was involved in an active cover up of the officer's obviously unconstitutional behavior." (*Id.*) The SAC also makes allegations against Defendant Capra with respect to the exhaustion issue – namely, that Defendant Capra failed to respond to Plaintiff's appeal. (*Id.* ¶¶ 32, 34–35.)

None of these allegations is sufficient to plead Defendant Capra's personal involvement in the alleged offense under *Colon*. Indeed, Plaintiff does not allege that Capra participated directly in any constitutional violation; the only direct action alleged is the failure to respond to a grievance that, under Plaintiff's own version of events, was never filed with the grievance clerk in the first place – a far cry from a constitutional violation. (*Id.* ¶ 26.) Nor does Plaintiff plead facts that suggest that Capra failed to remedy the wrong after being informed of it, as the Complaint does not allege that there had been any determination of wrongdoing on Defendant Holliday's part which Capra subsequently refused to address. Further, Plaintiff points to no specific policy or custom – either established or permitted to continue by Defendant Capra – that could have led to the alleged assault. Finally, Plaintiff does not plausibly plead either gross negligence or deliberate indifference on the part of Capra. The mere fact that Defendant Holliday had been previously sued by an inmate – without any allegation that this prior lawsuit yielded a determination of wrongdoing

10

– and Plaintiff's unsupported allegation that Defendant Holliday had been the subject of numerous prior complaints do not make plausible the inference that Capra was "grossly negligent" in supervising him, nor can such allegations establish deliberate indifference. Accordingly, Plaintiff has not sufficiently pleaded Defendant Capra's personal involvement.

The SAC's allegations are even more deficient as to Defendant Annucci. In addition to the joint allegation that Defendants Capra and Annucci were "supervisors" who "knew or were willfully ignorant" of prior violations by the officers in question and "knew of the actions and policies" that led to the incident (*id.* ¶ 18), the SAC alleges that Annucci "was, at the time of the incident, the acting supervisor" for DOCCS and, in that role, both "implemented and institutionalized the policies and practices" that led to the assault and "failed to remedy" those "obviously flawed policies and practices" (*id.* ¶ 51). These sparse, conclusory assertions are insufficient to plead Annucci's personal involvement in any violation. Plaintiff points to no specific policy or practice and sets forth no facts supporting his assertions. Plaintiff thus fails to state a plausible claim for relief against Defendant Annucci.

Plaintiff insists that the claims against Defendants Capra and Annucci must proceed, arguing that "three affidavits from other inmates" further "bolster" the SAC's allegations by showing that Defendant Holliday was a "known problem." (Opp'n at 24 (citing Doc. No. 41 Exs. 8–10).) As an initial matter, the discovery materials to which Plaintiff cites are not cognizable at the motion to dismiss stage, where the Court considers the sufficiency of Plaintiff's complaint alone. The proper procedural mechanism for placing those facts before the Court would be to seek leave to amend the Complaint for a third time to incorporate the new facts. However, any such request would be denied as futile, because the additional facts on which Plaintiff relies in his opposition to the motion to dismiss do nothing to salvage his claims. Of the cited documents, the

affidavit of Carlton Wilson makes no reference to Defendant Holliday being a known problem (Doc. No. 41 Ex. 9); the affidavit of Richard Prittler refers only to his *own* knowledge that Defendant Holliday had been "harassing" Plaintiff by singling him out for searches (Doc. No. 41 Ex. 10); and the affidavit of Leonard Carter seemingly refers to a general knowledge of the behavior among inmates (Doc. No. 41 Ex. 8 ("We all knew that [Defendant Holliday] was harassing [Plaintiff]" by consistently picking him for searches)). None of these statements suggests that there had been any finding of wrongdoing with respect to Defendant Holliday's behavior, let alone a pattern of wrongdoing so established that it would or should have been known to Defendant Holliday's supervisors. Even if the Court were to consider these facts, then, Plaintiff has failed to plausibly plead personal involvement by either Defendant Capra or Defendant Annucci.

Plaintiff's allegations with respect to these two Defendants thus fall far short of the *Twombly* standard, and the claims against Defendants Capra and Annucci are properly dismissed pursuant to Rule 12(b)(6).

### C. Other Claims

In addition to his excessive-force and failure-to-protect claims, Plaintiff also claims that he was denied medical services, unconstitutionally placed in the SHU, improperly transferred to other facilities, and deprived of his legal papers, along with unspecified violations of Plaintiff's First, Fourth, Fifth, and Fourteenth Amendment rights.[9] (SAC ¶¶ 23–24, 37–38, 45, 48, 53.) However, the SAC's allegations as to these claims are wholly conclusory and devoid of any supporting facts. With respect to the denial of medical services, the SAC states that Plaintiff was "denied medical

---

[9] To the extent that the SAC also makes a claim that Defendants conspired with one another to violate Plaintiff's rights, Plaintiff concedes that such claims are barred by the intracorporate conspiracy doctrine. (Opp'n at 25.) The Court therefore grants Defendants' unopposed motion to dismiss these claims.

attention for approximately 3 hours" despite "severe and obvious" injuries, and that "[u]pon information and belief, [Defendant] Holliday cooperated with other officers and supervisors to deny [Plaintiff] the medical care he obviously required by moving him from location to location within Sing Sing in order to avoid detection by medical [personnel]." (*Id.* ¶¶ 23–24.) Yet the SAC provides no supporting facts as to these allegations and does not account for how, in light of an alleged concerted effort to deny medical care to Plaintiff, he ultimately received "six stitches . . . from an outside medical center." (*Id.* ¶ 20.) The SAC's bare allegations thus fail to render Plaintiff's claim plausible.

As to Plaintiff's placement in the SHU, the SAC offers only a legal conclusion, stating that Plaintiff "was unconstitutionally placed in [the SHU] in order to cover up the assault on him and to prevent [Plaintiff] from accessing the grievance process." (*Id.* ¶ 37.) This lone statement is not sufficient to state a claim under *Twombly* in light of Plaintiff's failure to plead supporting facts or specify the role of any Defendant in the alleged violation. So too for the SAC's unsupported claim that "shortly after the assault [Plaintiff] was transferred to other correctional facilities and deprived of his legal papers." (*Id.* ¶ 38.) Again, Plaintiff fails to specify what role the individual Defendants played or what papers were taken. Likewise, the SAC's boilerplate references to First, Fourth, Fifth, and Fourteenth Amendment violations – without specification of any conduct by any Defendant that allegedly violated Plaintiff's constitutional rights under those Amendments – is plainly insufficient. In light of the SAC's sparse and conclusory allegations with respect to these claims, Plaintiff has failed to "nudge[] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Defendants' motion to dismiss these claims is therefore granted.[10]

---

[10] It bears noting that the SAC's claims regarding denial of medical treatment, unconstitutional placement in the SHU, improper transfer to other facilities, and deprivation of legal papers are *entirely* absent from Plaintiff's grievance. (*See* Doc. No. 41 Ex. 1.)

III. Exhaustion of Administrative Remedies

The Court now turns to the question of whether Plaintiff has exhausted administrative remedies with respect to his sole surviving claims – the excessive-force and failure-to-protect claims against Defendant Holliday. For the reasons stated below, Defendants' motion for summary judgment on exhaustion grounds is denied.

A. Legal Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, a court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997)). "Conclusory allegations, conjecture, and

speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "show[s] – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted).

Under the Prison Litigation Reform Act ("PLRA"), inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (internal quotation marks and alterations omitted)). As the Supreme Court and Second Circuit have instructed, "proper exhaustion . . . means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Hernandez v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Woodford*, 548 U.S. at 90). "The exhaustion inquiry thus requires that we look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009).

The Supreme Court has clarified that an inmate's failure to exhaust may only be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136

15

S. Ct. at 1858. The Supreme Court recognized "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859.[11] First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 532 U.S. 731, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Ross*, 136 S. Ct. at 1859. To meet this high bar, the administrative remedy must be "essentially unknowable." *Id.* (internal quotation marks omitted). Finally, a grievance process is unavailable "when prison administrators thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation." *Id.* at 1860.

In *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016), the Second Circuit elaborated upon *Ross*'s "opaqueness" unavailability exception, holding that the grievance program is functionally unavailable in the "extraordinary circumstance[]" of an inmate housed in the SHU who hands a grievance to a corrections officer who thereafter fails to file it. *Id.* at 124. The Second Circuit reasoned that because "[o]n their face, the regulations only contemplate appeals of grievances that were actually filed," it was "practically impossible for [the plaintiff] to ascertain whether and how he could pursue his grievance" and therefore "the regulatory scheme . . . [was] 'so opaque' and 'so confusing that . . . no reasonable prisoner can use [it].'" *Id.* (quoting *Ross*, 136 S. Ct. at 1859). Because administrative remedies were thus unavailable within the meaning of *Ross*, the Second

---

[11] While the Second Circuit has suggested that these scenarios are merely illustrative and "not . . . exhaustive," *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), these illustrations nonetheless guide the Court's inquiry.

16

Circuit found that Williams had satisfied the PLRA's exhaustion requirement.

B. Discussion

Under the IGP, an inmate must exhaust all available administrative remedies by completing all three steps before filing suit in federal court, and "only after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted." *Laguna v. Kwan*, No. 13-cv-7079 (VB), 2015 WL 872366, at *3 (S.D.N.Y. Jan. 28, 2015) (quoting *Gardner v. Daddezio*, No. 07-cv-7201 (SAS), 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5, 2008)). Here, under the IGP's procedure, Plaintiff was initially required to file a grievance with the IGRC within twenty-one calendar days of the December 28, 2014 incident, that is, no later than January 18, 2015.[12] N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(a)–(b). If, in fact, Plaintiff timely attempted to file his grievance by handing it to an officer while in SHU and that officer failed to file the grievance, Plaintiff's avenues for pursuing the grievance would be unavailable under *Williams*, excusing him from any further exhaustion requirements.[13] *Williams*, 829 F.3d at 124.

In light of *Williams*, Plaintiff has sufficiently demonstrated that a genuine dispute of material fact exists with respect to whether he successfully exhausted his Eighth Amendment excessive-force and failure-to-protect claims against Defendant Holliday. Plaintiff maintains that he drafted and attempted to file a grievance detailing the December 28 assault on December 30 –

---

[12] The parties do not address whether Plaintiff's grievance, had it been successfully filed, would have been subject to the ordinary three-step process or – as is more likely given the allegation of the use of excessive force by an officer – to the expedited review process for harassment claims. However, the distinction is immaterial here because, in light of *Williams*, the key factual dispute centers on whether Plaintiff took the initial step to file a grievance – a step that is identical under both regimes.

[13] One may argue that Plaintiff's allegations fall squarely within another of *Ross*'s unavailability scenarios, namely, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. 1860. However, because the Second Circuit considered a substantially identical circumstance in *Williams* and deemed it to implicate the "opaqueness" exception, the Court adopts that approach here.

well within the twenty-one day period for initiating a claim – but that the officer to whom he handed the grievance failed to file it. In support of his version of events, Plaintiff points not only to his own testimony, but also to a copy of the alleged grievance. (Doc. No. 41 Ex. 1.) He also argues that the fact that the grievance was filed on ordinary stationery, rather than the proper form, gives rise to a plausible inference that corrections officers were interfering with his attempt to file a grievance. (Opp'n at 10, 12.) Furthermore, though they do not specifically mention Plaintiff's grievance, statements in two affidavits by fellow inmates refer to Plaintiff being repeatedly singled out and harassed by Defendant Holliday. (*See* Affidavit of Leonard Carter, Doc. No. 41 Ex. 8 ("We all knew that [Defendant Holliday] was harassing [Plaintiff], because out of all the inmates in the company, he was always picked by [Defendant Holliday] for a search."); Affidavit of Richard Prittler, Doc. No. 41 Ex. 10 ("[Plaintiff] has been telling me for about three months that [Defendant Holliday] has been constantly harassing him [while] leaving the messhall and/or going to the yard.").) Viewed in the light most favorable to Plaintiff, those statements lend further credence to Plaintiff's claim by suggesting that officers may have been motivated to interfere with his grievance process.

Meanwhile, the evidence set forth by Defendants that Plaintiff failed to exhaust his administrative remedies is, for the most part, consistent with Plaintiff's claim that his grievance was destroyed or otherwise obstructed by corrections officers. The absence of any official records of Plaintiff's grievance or appeal comports with Plaintiff's assertion that the officer to whom he handed his grievance failed to file it. Defendants' attempts to distinguish *Williams* by pointing to Plaintiff's well-developed understanding of the grievance process (Mem. at 16–17) are unavailing – in light of the Second Circuit's finding that the IGP regulations "simply do not contemplate the situation" in which a SHU inmate's grievance is never "actually filed," Plaintiff's familiarity with

the *standard* IGP regulations could hardly make his situation less "opaque" or render administrative remedies more available. *Williams*, 829 F.3d at 124. If anything, Plaintiff's understanding of how the IGP process functions in the ordinary course bolsters the inference that the usual process did not unfold in this circumstance by suggesting that the filing failure did not result from Plaintiff's own ineptitude. Ultimately, then, Defendants rely solely on the absence of direct evidence that a corrections officer tampered with Plaintiff's grievance, as well as the standard practices and procedures at Sing Sing, which would have required Plaintiff's grievance to be hand-delivered to the grievance office and mandated the retention of files. N.Y. Comp. Codes R. & Regs., tit. 7, §§ 701.6(k)(3), 701.7(a).

Thus, when viewed in the light most favorable to Plaintiff, the record reflects a genuine dispute as to a material fact sufficient to withstand summary judgment on the issue of exhaustion. Because factual disputes related to administrative exhaustion are properly resolved by the Court rather than a jury, *see Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011), the Court will hold an evidentiary hearing to determine whether Plaintiff exhausted his administrative remedies with respect to his Eighth Amendment excessive-force and failure-to-protect claims against Defendant Holliday. Accordingly, Defendants' motion for summary judgment is denied as to those claims.

### IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT Defendants' motion for partial dismissal of Plaintiff's complaint is GRANTED. Accordingly, Plaintiff's claims against Defendants Capra and Annucci are DISMISSED, as are Plaintiff's claims against Defendant Holliday with the exception of Plaintiff's excessive-force and failure-to-protect claims. Defendants' motion for summary judgment as to the remaining claims for failure to exhaust administrative remedies is DENIED.

IT IS FURTHER ORDERED THAT the parties shall appear for an evidentiary hearing

regarding whether Plaintiff administratively exhausted the only remaining claims in his case – his excessive-force and failure-to-protect claims against Defendant Holliday – on Friday, May 17, 2019 at 9:30 a.m. Accordingly, IT IS HEREBY ORDERED THAT, by Monday, May 6, 2019, the parties shall submit a joint letter that includes, in separately numbered paragraphs, the following information:

    i.    Any stipulations of fact or law that have been agreed upon by the parties;

    ii.    A statement by each party as to the witnesses whose testimony is to be offered in the party's case-in-chief;

    iii.    A list by each party of exhibits to be offered in the party's case-in-chief, with an indication as to whether any party objects to any such exhibits and a brief statement of the nature of the objection (*e.g.*, "relevance," "authenticity," "hearsay"); and

    iv.    A statement by each party as to how long they anticipate the hearing to last.

IT IS FURTHER ORDERED THAT, by Monday, May 6, 2019, each party shall serve (but not file) copies of all documentary evidence or other exhibits, which shall be compiled in tabbed binders and organized by exhibit number, and shall submit two courtesy copies of these submissions as well as digital copies on CD or DVD discs to chambers.

The Clerk of Court is respectfully directed to terminate the motion pending at Doc. No. 30.

SO ORDERED.

Dated:    March 29, 2019
           New York, New York

                                          RICHARD J. SULLIVAN
                                          UNITED STATES CIRCUIT JUDGE
                                          Sitting by Designation