UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELMER ORTIZ,

                    Plaintiff,

        -v-

CORRECTIONS OFFICER S. HOLLIDAY,
CORRECTIONS OFFICERS JOHN/JANE
DOES # 1–10,

                    Defendants.

No. 17-cv-3620 (RJS)
OPINION & ORDER

RICHARD J. SULLIVAN, Circuit Judge:

        In 2017, Plaintiff Elmer Ortiz filed suit under 42 U.S.C. § 1983 against officials of the New

York State Department of Corrections and Community Supervision ("DOCCS"), alleging

violations of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights in connection with

a use-of-force incident at Sing Sing Correctional Facility.  Several months later, Defendants moved

for summary judgment on the grounds that Ortiz failed to exhaust his administrative remedies

before filing suit.  *See* 42 U.S.C. § 1997e(a).  Because Ortiz had introduced some evidence that his

efforts to comply with the grievance procedures were thwarted by prison officials, the Court

ordered a hearing on the exhaustion issue, at which Ortiz and several others testified.  After

carefully considering this testimony, as well as additional evidence introduced after the hearing,

the Court finds Ortiz's assertions to be not credible, and concludes that Ortiz failed to exhaust his

available administrative remedies.

## I.   BACKGROUND

        According to the operative complaint, Corrections Officer S. Holliday and other

corrections officers violently assaulted Ortiz on December 28, 2014.  (Second Amended

Complaint ("SAC") ¶¶ 15–16.)  Though the complaint omitted details about events leading up to

the assault, it stated that Ortiz "was stomped on, kicked, punched and thrown to the ground while handcuffed," which "caused major bruises and required six stitches being applied to a gash in [Ortiz's] forehead." (*Id.* ¶¶ 19–20.)  Ortiz alleged that Officer Holliday used excessive force against him and failed to protect him, in violation of the Eighth Amendment.  In addition, Ortiz named Sing Sing's Superintendent Michael Capra and DOCCS Commissioner Anthony Annucci, claiming that they neglected to properly supervise the corrections officers. (*Id.* ¶ 18).  Ortiz also alleged violations of his rights under the First, Fourth, Fifth, and Fourteenth Amendments based on actions taken against him after the assault, including an alleged denial of medical services, his placement in solitary confinement, his improper transfer to another facility, and the destruction of his legal papers. (*Id.* ¶¶ 24, 37–38, 48, 53, 56–59, 63–64.)  Most importantly for purposes of this Opinion and Order, Ortiz alleged that he attempted to exhaust his administrative remedies by filing a grievance after he was assaulted. (*Id.* ¶¶ 25–26.)

Following limited discovery on the exhaustion issue, Defendants moved for partial dismissal of the complaint under Rule 12(b)(6) on most claims and for summary judgment on exhaustion grounds. (Doc. No. 30.)  The Court dismissed claims against Capra and Annucci, along with the claims related to the denial of medical services, Ortiz's placement in solitary, his transfer to another prison, and destruction of his property.  This partial dismissal left only Ortiz's Eighth Amendment excessive-force and failure-to-protect claims against Officer Holliday. (Doc. No. 44 at 19–20.)  At the same time, the Court denied Defendants' request for summary judgment in light of a genuine factual dispute about whether Ortiz exhausted his administrative remedies:  While Defendants asserted that they had no record of any grievance of the alleged assault, Ortiz insisted that he attempted to timely file his grievance by handing it to an unnamed corrections officer, but that his grievance never reached its destination. (*Id.* at 17–18.)  Presented with this factual dispute,

2

the Court ordered an exhaustion hearing and directed the parties to submit a joint letter before the hearing stipulating to any agreed upon law or facts.  (*Id.* at 19–20.)

## A.      The DOCCS Grievance Process

In their joint pre-hearing letter, the parties outlined the administrative process by which a prisoner could complain against a prison official.  (Doc. No. 55.)  DOCCS regulations, which govern the Inmate Grievance Program at Sing Sing, generally require inmates to complete a three-step process to exhaust their administrative remedies.  First, usually within twenty-one days of an incident, an inmate must file a grievance with the Inmate Grievance Resolution Committee ("IGRC"), providing the IGRC with "a concise, specific description of the problem and the action requested."  N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7 § 701.5(a).  After receiving a grievance, the IGRC has sixteen days either to resolve the grievance informally or to hold a hearing.  *Id.* § 701.5(b)(1)–(2).  Second, if the IGRC renders an adverse decision, the inmate may appeal to the superintendent of the facility within seven days of the IGRC's ruling; the superintendent then has twenty days to respond.  *Id.* § 701.5(c).  Third, if the superintendent renders an adverse determination, the inmate has seven days to appeal to the Central Office Review Committee ("CORC"), which must then decide the appeal within thirty days.  *Id.* § 701.5(d)(1)(i), (d)(3)(ii).

DOCCS regulations also provide an expedited, two-step review process when an inmate alleges harassment by prison staff.  The expedited process begins the same way as the ordinary process, with an inmate filing a grievance with the prison's IGRC.  *Id.* § 701.8(a).  Under expedited review, however, IGRC then forwards the grievance directly to the facility superintendent, who has twenty-five days to respond.  *Id.* § 701.8(b), (f).  Once the superintendent issues a decision, an inmate hoping to challenge the decision must file an appeal with CORC within seven days.  *Id.*

§ 701.8(h).  Under both the ordinary and expedited review process, "matters not decided within the time limits may be appealed to the next step."  *Id.* § 701.6(g)(2); *see also id.* § 701.8(g).

**B.      Exhaustion Hearing**

On July 10, 2019, the Court held a hearing to determine whether Ortiz had administratively exhausted his claims against Holliday.  During the hearing, Ortiz testified that he was familiar with the grievance process since he had filed complaints in the past.  (Doc. No. 62 at 23–24.)  He further testified that, on the afternoon of December 29, 2014 (the day after he was allegedly assaulted), Ortiz was residing in the Special Housing Unit ("SHU").  Ortiz testified that, on that date, he asked a patrolling corrections officer for a grievance form, which the officer did not have.  (*Id.* at 25–26.)  When Ortiz spotted the same officer later that day, Ortiz requested "some paper and some carbon paper" so that he could "file a grievance."  (*Id.* at 28.)  According to Ortiz, the officer returned about thirty minutes later to drop off the requested materials.  (*Id.* at 29.)

Ortiz testified that he then drafted his grievance on the carbon paper, putting "the original [grievance] inside [an] envelope addressed to IGRC," and placing the carbon copy in one of his envelopes of legal work.  (*Id.* at 31).  This carbon copy, which was retained by Ortiz and introduced as evidence during the exhaustion hearing, described the assault and listed the names of three prison officers involved.  (Plaintiff's Ex. 1.)

On December 30, 2014, according to Ortiz, he deposited his original grievance into a locked mailbox carried by the same patrolling officer who had interacted with him on the previous day.  When asked at the exhaustion hearing what the officer's name was, Ortiz testified that he did not recall.  Ortiz four times referred to the corrections officer as "a regular" in the SHU, and offered a description of the officer's height, age, build, race, hair, and lips.  (Doc. No. 62 at 28, 31, 36, 42.)  Ortiz, who was in the SHU for about 45 days (*see* Doc. No. 55 at 3), testified that he saw this

4

officer nearly every day during that time, that he "knew [the officer's] name at the time," but that he could no longer "remember [the officer's] name" (Doc. No. 62 at 35–36).

According to Ortiz, no one responded to the grievance he allegedly handed to the unnamed officer. Hearing nothing, Ortiz asked the same officer for writing materials to appeal his grievance. (*Id.* at 42–43.) After that, in a letter dated February 3, 2015, Ortiz reported to the grievance committee that he had not received a timely decision from the IGRC, and asserted his right "to appeal to the . . . Superintendent." (Plaintiff's Ex. 2.) Seven days later, the Inmate Grievance Program Supervisor, Quandera Quick, responded to Ortiz's February 3 letter, explaining that Ortiz's most recent complaint on record had been filed in September 2014, had already resulted in a hearing and appeal, and had already been addressed by the Superintendent. (Plaintiff's Ex. 3.) Quick told Ortiz that "this office has no other record of a complaint filed by [him]." (*Id.*) Ortiz testified that he wrote back to Quick and "specified exactly what grievance" he had written about. (Doc. No. 62 at 92.) At the exhaustion hearing, Ortiz produced a carbon copy of his first letter (*see* Plaintiff's Ex. 2) – the one to which Quick responded (Plaintiff's Ex. 3) – but testified that he did not make a copy of the second letter (Doc. No. 62 at 91).

About a week after his exchange with Quick, Ortiz testified, he attempted to appeal to CORC; again, however, he never received a response. (*Id.* at 73, 97.) While Ortiz stated at the exhaustion hearing that he created a copy of his appeal, he claimed that the copy was lost when one of his three legal folders went missing during his transfer to a new prison facility. (*Id.* at 73–74.) Ortiz also testified that a letter he had written to the inspector general about the assault was likewise lost, but he nevertheless retained copies of several other documents he had written or received about the incident – including letters he sent to the governor, the district attorney, the

attorney general, a copy of the grievance he allegedly filed, a copy of his initial appeal, and Quick's response to it.  (*Id.* at 98; Plaintiff's Exs. 1–3.)

In addition to Ortiz, several other witnesses testified at the exhaustion hearing.  Richard Prittler, another inmate at Sing Sing, testified that he had attempted to file grievances against officers six or seven times, but that each time he placed his grievance in the regular mailbox (instead of a grievance box or handing the complaint to "somebody who works in the grievance office"), the grievance was never filed.  (Doc. No. 62 at 107–08.)  The last time he tried to file using regular mail was 2008 (*id.* at 108) – six years before Ortiz allegedly filed his grievance by inserting it in the regular mailbox.  Quick also took the witness stand.  She explained that inmates could file a grievance by placing it in the regular mail, that corrections officers were not permitted to destroy such complaints, and that her office treated grievances drafted on ordinary paper the same way as those written on a grievance form.  (*Id.* at 124–25, 132–33, 137.)  Quick testified that staff in the grievance office make weekly rounds in the SHU, which would be recorded in the SHU's sign-in logbooks.  (*Id.* at 186–87.)  Superintendent Capra testified next, and confirmed that everyone who comes into the SHU must sign in.  (*Id.* at 205–06.)  Finally, Rachael Seguin, the assistant director of the Inmate Grievance Program, testified that CORC maintains a database of every appeal and all appeal-related correspondence; though she located three appeals in which Ortiz was a grievant, none was related to the use-of-force incident from December 2014.  (*Id.* at 227.)[1]

---

[1] Two days before the hearing, Ortiz requested to add two new inmate witnesses who were expected to testify that Quick "routinely destroyed grievances."  (Doc. No. 56.)  But since Ortiz failed to email a copy of his request to chambers in accordance with the Court's local rules, his request came to the Court's attention the day before the hearing, and the Court decided to proceed as the parties had originally agreed (Doc. No. 57), ultimately reserving decision on the last-minute issues raised by Ortiz.  The request is now denied as moot in light of the Court's determination that Ortiz never attempted to file a grievance related to the December 2014 assault.

Before the hearing concluded, the Court directed Defendants to provide the sign-in logbook for the Sing Sing SHU, as well as the logbook of the specific gallery where Ortiz was housed, for the period between December 28, 2014 and February 15, 2015, which spanned a few days more than the entire time Ortiz resided in the SHU.  (*Id.* at 215–16.)  The Court further instructed Defendants to identify any of those employees who matched Ortiz's description of the patrolling officer to whom Ortiz allegedly handed his grievance.[2]

## C.    Post-Hearing Submissions

During the thirteen months following the exhaustion hearing, the parties worked together to identify the unnamed corrections officer who allegedly delivered the writing materials to Ortiz on December 29, 2014 and received the grievance from Ortiz on December 30, 2014.  Defendants submitted the SHU sign-in logbooks and named six current or former employees who worked in the SHU on December 30, 2014 who matched Ortiz's physical description of the officer who purportedly took Ortiz's grievance on that date.  (Doc. No. 66.)  For his part, Ortiz noted that one of the six identified corrections officers, Jason Duggins, had been on duty each day during the relevant time period.  (Doc. No. 70.)

In light of that development, the Court then scheduled another day of testimony at which Officer Duggins would be called.  (Doc. No. 71.)  But while the logbooks reflected that Duggins had worked in the SHU on the relevant dates, Sing Sing reported that he had worked in a different gallery from the one where Ortiz was housed.  (Doc. No. 72.)  Faced with this information, Ortiz sought a hearing in which four other corrections officers – but not Duggins – would testify.  (Doc. No. 77.)  Soon after, however, the parties moved to adjourn the hearing *sine die*, and Defendants

---

[2] The Court also requested a list of Sing Sing employees who worked in the SHU during that same period, but Defendants represented that such information had been destroyed in the ordinary course of business.  (Doc. No. 66.)

agreed to share photographs of the four officers Ortiz had planned to call.  (Doc. No. 78.)  The Court granted the adjournment, and directed the parties to submit a joint letter by December 18, 2019 to provide an updated list of the corrections officers that Ortiz wished to call for a hearing. (Doc. No. 79 at 2.)

After the Court issued that order, the parties requested eleven separate extensions to identify the unnamed officer who had allegedly taken Ortiz's grievance.  (Doc. Nos. 81, 83, 85, 86, 88, 90, 92, 94, 96, 98, 100, 102.)  Though Defendants showed Ortiz the four photographs he had initially requested to view, as well as photographs of several other officers who worked in the SHU in late December 2014, Ortiz indicated that none of them depicted the officer who collected his grievance.  (Doc. No. 83.)  Ortiz then requested that Sing Sing identify officers who worked in the SHU at the end of December 2014, who fit Ortiz's description of the corrections officer, but whose names were *not* listed in the SHU logbooks for December 29 and 30, 2014.   (*Id.*) Ultimately, however, Ortiz walked this request back, opting instead to limit the search to the dates Ortiz claimed to have interacted with the officer (plus one additional date).  (Doc. No. 86.)  As Ortiz continued to shift tactics and seek extensions, the Court twice warned that, "should there be additional significant delays, the Court will entertain a motion to dismiss under Federal Rule of Civil Procedure 41(b) for failure to prosecute."  (Doc. Nos. 101, 103.)

Ortiz eventually viewed the photographs he requested.  From these pictures, Ortiz could not "positively identify the officer in question."  (Doc. No. 104 at 1.)  Nevertheless, because he "still insist[ed] on pursuing all avenues to identify the officer he handed his grievance to," Ortiz requested permission to call two corrections officers to whom, admittedly, "he did not give [his] grievance," on the theory that these officers "would have information or recollection of who their

alternates were during the holidays of 2014." (*Id*. at 2.)  Defendants opposed this request (*id.*), which the Court now denies for the reasons discussed below.

## II.   ANALYSIS

The sole issue currently before the Court is whether Ortiz exhausted his administrative remedies.  Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This "mandatory language means a court may not excuse a failure to exhaust."  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).  In other words, an inmate can sue in federal court only after "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)."  *Hernandez v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)).

The PLRA, however, contains "the significant textual qualifier that the remedies must indeed be available to the prisoner."  *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (internal quotation marks omitted).  An administrative procedure is "unavailable" if (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the process is "so opaque that it becomes, practically speaking, incapable of use;" or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Ross*, 136 S. Ct. at 1859–60; *see Hayes v. Dahlke*, 976 F.3d 259, 268 (2d Cir. 2020).

The Second Circuit has held that where a corrections officer fails to file a grievance handed to him by an inmate in the SHU, the grievance program becomes functionally unavailable to the inmate.  *See Williams*, 829 F.3d at 126–27.  After all, "[o]n their face, the [DOCCS] regulations only contemplate appeals of grievances that were actually filed," making it "practically

9

impossible" for an inmate "to ascertain whether and how he could pursue his grievance" when his grievance disappeared after he attempted to file it. *Id.* at 124. The "regulatory scheme" would thus be "'so opaque' and 'so confusing that . . . no reasonable prisoner can use [it].'" *Id.* (quoting *Ross*, 136 S. Ct. at 1859). And since an inmate in the SHU can file a grievance by giving it to a corrections officer, *id.* at 124, he would have exhausted all available remedies if he did so and the grievance subsequently vanished, *see id* at 126.[3]

Here, Ortiz argues that his case falls within *Williams*'s "opaqueness" exception because his grievance disappeared after he placed it in the locked mailbox carried by the unnamed corrections officer. But after hearing several hours of testimony, observing Ortiz' demeanor, and considering his failure to identify any officer who matched the description of the officer in question, the Court finds Ortiz's account to be not credible.

To start, it is telling that Ortiz could not recall the officer's name – despite the fact that Ortiz knew the names of several other officers (including those who assaulted him), allegedly interacted with the unnamed officer on several occasions, and purportedly saw the mystery officer nearly every day during his 45-day stay in the SHU. (*See* Doc. No. 62 at 35–36; Plaintiff's Ex. 1.) And while Oritz claimed that he previously knew (and simply forgot) the officer's name, reviewing the SHU's sign-in logbooks did not jog Ortiz's memory. Nor could Ortiz identify the officer after reviewing the photographs Defendants showed him. (Doc. No. 104 at 1.)

Ortiz suggests that his trouble in remembering the name of the officer lies with the SHU's logbooks because they "appear to be inaccurate" and contain "numerous discrepancies." (*Id.* at

---

[3] Before his exhaustion hearing, Ortiz stipulated that a valid way to file a grievance was to hand it to a corrections officer. (Doc. No. 55 at 3.) Although Ortiz later contradicted himself and informed the Court that he could "no longer agree" that this was a legitimate way to file (Doc. No. 56 at 4), Ortiz was in fact correct the first time. *See Williams*, 829 F.3d at 124 ("Prison regulations provide that inmates in the SHU may file grievances by giving the complaint to a correction officer to forward to the grievance clerk." (citing NYCRR tit. 7 § 701.7)).

2.)  But while the logbooks do not reveal signatures for grievance staff members who made weekly rounds in the SHU in February 2015 (well after the alleged assault in December 2014) (Doc. No. 70 at 2), that has no bearing on the identity (and existence) of an unnamed corrections officer assigned to the SHU whom Oritz allegedly saw almost every day for a month and a half beginning in late December 2014.  Surely, one would have expected Ortiz's memory to be refreshed by viewing the officer's name in the logbook entries or reviewing his photograph, especially since Ortiz testified not only to having seen the officer frequently – sometimes several times a day – but also to previously knowing the officer's name.  As it turns out, Ortiz could not identify the officer either by name, or in any of the photographs provided, thus underscoring the implausibility of his testimony.

Ortiz's testimony also fell short in other respects.  For instance, while Ortiz testified that he wrote a follow-up letter to Quick after she told him that there was no record of his grievance, Ortiz admitted that he did not make a copy of that letter, notwithstanding his professed practice of creating copies and maintaining careful records of his grievance materials.  (*See* Doc. No. 62 at 98; Plaintiff's Exs. 1–3.)  Nor is there any other record support suggesting that he mailed a second letter to Quick.  Similarly, though Ortiz claimed to have appealed directly to CORC, there is no physical evidence of that appeal either.  Ortiz testified that he created a carbon copy of the appeal, but placed the copy in a folder of legal papers that was distinct from the folder containing most of his other assault-related letters, and which was ultimately lost.  (Doc. No. 62 at 73–74.)  Most importantly, Seguin testified that CORC's database of appeals did not contain an appeal from Ortiz related to the December assault.  (*Id.* at 227.)  In short, this lack of records, coupled with Ortiz's convenient possession of certain carbon copies but not others, and his persistent inability to identify the unnamed officer, supports the inference that the December 29, 2014 carbon copy of

his grievance was manufactured after the fact in an attempt to excuse his failure to timely commence the grievance process in accordance with DOCCS procedures.

Having held a hearing and tolerated more than a year of false starts and postponements in order to provide Ortiz with an opportunity to identify the mystery officer to whom he allegedly "handed his grievance," the Court sees no purpose in compelling the testimony of two corrections officers to whom "he did *not* give [his] grievance." (Doc. 104 at 1–2 (emphasis added).) In the end, the Court is wholly persuaded that Ortiz never placed his assault-related grievance in the mailbox carried by a corrections officer, and that his assertions to the contrary are fabrications. As a result, the Court finds that Ortiz failed to exhaust his administrative remedies, which is fatal to his remaining claim. *See Hernandez*, 582 F.3d at 305; *Williams*, 829 F.3d at 124, 126.

### III.   CONCLUSION

In light of the Court's finding of fact that Ortiz did not file a grievance, IT IS HEREBY ORDERED that his Second Amended Complaint (Doc. No. 24) is DISMISSED in its entirety for failure to exhaust his available administrative remedies before filing this action, as required by the PLRA. It is further ORDERED that Ortiz's request to call additional witnesses is DENIED as moot. Finally, it is respectfully ORDERED that the Clerk of the Court shall enter judgment for Defendants and close this case.

SO ORDERED.

Dated:     April 7, 2021
           New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation